EUGENE D'ANGELO ET AL. *v.* JOHN MCGOLDRICK ET AL.

(15444)

Callahan, C. J., and Borden, Berdon, Katz and Peters, Js.

Argued September 25—officially released December 3, 1996

*John K. McDonald,* for the appellants (plaintiffs).

*Margaret Q. Chapple,* assistant attorney general, with whom were *Henri Alexandre,* assistant attorney gen-

eral, and, on the brief, *Richard Blumenthal*, attorney general, for the appellees (defendants).

PETERS, J. General Statutes § 31-51q[1] provides a cause of action for damages for an employee who has been disciplined or discharged on account of the exercise by such employee of various constitutional rights including the freedom of speech. The principal issue in this case is whether the plaintiffs, Eugene D'Angelo and Vincent DeRosa, can prevail in their cause of action under this statute without establishing a causal connection between their disciplinary transfers and the exercise of their constitutional rights. The complaint of the plaintiffs, two Connecticut state troopers, alleged that the defendants,[2] Captain John McGoldrick, the commanding officer of the statewide narcotics task force (task force), and Nicholas Cioffi, the commissioner of the department of public safety, had wrongfully transferred them from the task force[3] for exercising their

[1] General Statutes § 31-51q provides in relevant part: "Liability of employer for discipline or discharge of employee on account of employee's exercise of certain constitutional rights. Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages. . . ."

[2] The plaintiffs also named as a defendant Major Reuben Bradford, the commanding officer of the bureau of criminal investigations. At the close of the plaintiffs' case, however, the trial court granted the defendants' motion to dismiss with respect to Bradford. The plaintiffs have not challenged this decision.

[3] Pursuant to their union contract, the plaintiffs initially filed grievances with the state police department's labor relations unit seeking reinstatement to the task force. Their grievances were both denied. The plaintiffs then pursued their claims through arbitration. On March 4, 1995, an arbitrator ruled that the plaintiffs had been transferred in violation of their union

rights to free speech. After a court trial, the trial court rendered judgment for the defendants. The plaintiffs appealed from this judgment to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

The trial court reasonably could have found the following facts. The plaintiffs, who were state troopers assigned to the northwest office of the task force, had concerns about alleged misconduct at the task force on the part of Sergeant John Petrowski. On February 8, 1993, DeRosa voiced his complaint to a former supervisor, Sergeant William McGuire. Thereafter, McGuire spoke with D'Angelo, who described another of Petrowski's alleged transgressions. McGuire brought these allegations to the attention of officials at the internal affairs unit of the Connecticut state police and, at their request, summarized the plaintiffs' allegations in a written memorandum on February 9, 1993 (McGuire memorandum). McGuire left room for four signatures, identified by typed names, on the bottom of the memorandum: each of the plaintiffs, Sergeant Dennis Coyle (another task force officer), and himself.

During this same period in early 1993, McGoldrick, the commander of the task force, had begun to consider restaffing the northwest office of the task force. Animosity had developed between McGuire and Petrowski, and, although McGuire was no longer part of the task force, McGoldrick concluded that the hostility between these two sergeants had fostered a feud between their respective supporters in the northwest office. This, he felt, had resulted in a decline in productivity. To remedy

contract and ordered their reinstatement. The plaintiffs, however, had each already attained the rank of sergeant and chose not to reassume their positions as task force troopers.

the problem, in late 1992 or early 1993, McGoldrick had ordered Petrowski's transfer out of the unit.

On February 4, 1993, McGoldrick met with other supervisors at the task force to discuss further personnel changes. During this meeting, McGoldrick decided to transfer the plaintiffs, whom he considered to be allies of McGuire and participants in the intra-office feud.

On February 9, 1993, upon learning that the plaintiffs had been making copies of some of Petrowski's time records, McGoldrick decided to accelerate the plaintiffs' transfers. On the morning of February 10, 1993, McGoldrick, along with other task force leaders, met with the plaintiffs. Stating that he was "tired of recriminations," McGoldrick informed the plaintiffs that they would immediately be transferred to units outside the task force. Only later that afternoon did the plaintiffs sign the McGuire memorandum.

In their present suit against the defendants, the plaintiffs claim that their transfers were triggered by their allegations against Petrowski and the resulting McGuire memorandum. They maintain that the transfers violated § 31-51q because the transfers were disciplinary measures intended to punish them for exercising their right to free speech.

The trial court concluded, for a number of reasons, that the plaintiffs had failed to establish their claims under § 31-51q. First, the trial court determined that, rather than rising to the level of constitutionally protected speech, the plaintiffs' allegations against Petrowski constituted merely an "internal feud among employees." Second, the trial court found that, even if the plaintiffs had engaged in constitutionally protected speech, they had failed to demonstrate a causal link between their transfers and their derogatory statements about Petrowski. Third, the court found that the plain-

tiffs had also failed to prove that their conduct had "not substantially or materially interfere[d]" with their work. See General Statutes § 31-51q. Finally, the trial court interpreted § 31-51q not to encompass the plaintiffs' transfers within the term "discipline," and not to include either of the defendants within the term "employer."

Although on appeal the plaintiffs dispute all of the trial court's determinations,[4] we will confine our consideration to the validity of the trial court's conclusion with respect to causation. Without proof of a causal connection, there has been no compliance with the requirement in § 31-51q of "discipline or discharge on account of the exercise by [an] employee of rights guaranteed by the . . . United States Constitution or . . . the constitution of the state . . . ." The issue of causation has two components: (1) did the trial court, as a matter of law, use the proper test; and (2) did the trial court make a finding of fact that is not clearly erroneous. In the circumstances of this case, we conclude that the judgment of the trial court should be affirmed because, factually, the plaintiffs have failed to make out a prima facie case under § 31-51q.

Section 31-51q creates a cause of action for damages to protect employees from retaliatory action illegally grounded in the employees' exercise of enumerated constitutionally protected rights.[5] See *Lewis* v. *Gaming Policy Board*, 224 Conn. 693, 711, 620 A.2d 780 (1993).

[4] The plaintiffs claim that flaws in the trial court's analysis stem from its incorporation of portions of the defendants' trial brief into the memorandum of decision. We have previously expressed disapproval of a trial court's verbatim adoption of one party's findings of fact. *Grayson* v. *Grayson*, 202 Conn. 221, 223, 520 A.2d 225 (1987). In this case, however, the trial court did not adopt that portion of the defendants' brief that proposed findings of fact. The trial court, moreover, was within its discretion in composing its memorandum of decision; *Long* v. *Schull*, 184 Conn. 252, 258, 439 A.2d 975 (1981); and provided legal and factual analysis sufficient for this court to review its judgment.

[5] The statute encompasses rights guaranteed by the first amendment to the United States constitution, which provides that "Congress shall make no

The statute does not, however, indicate what burden it imposes on an employee to prove that a disciplinary measure was taken "on account of the exercise" of these enumerated rights.

The trial court determined that in order to prevail under the statute, the plaintiffs had the burden of establishing three elements: "(1) that [they] were exercising rights protected by the first amendment to the United States constitution or by an equivalent provision of the Connecticut constitution; (2) that [they were transferred] 'on account of' [their] exercise of first amendment or equivalent state constitutional rights; and (3) that [their] exercise of first amendment or equivalent state constitutional rights did not substantially or materially interfere with [their] bona fide job performance or with [their] working relationship with [their] employer." (Internal quotation marks omitted.)

The plaintiffs contend that the trial court's three part test was improper and propose instead that we should adopt the test set forth in *Schnabel* v. *Tyler*, 230 Conn. 735, 750, 646 A.2d 152 (1994). In *Schnabel*, a police officer filed an action against his police chief for, inter alia, retaliating against him in response to his criticism

law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

The statute also encompasses rights guaranteed by §§ 3, 4 and 14 of article first of the Connecticut constitution. Article first, § 3, provides: "The exercise and enjoyment of religious profession and worship, without discrimination, shall forever be free to all persons in the state; provided, that the right hereby declared and established, shall not be so construed as to excuse acts of licentiousness, or to justify practices inconsistent with the peace and safety of the state." Article first, § 4, provides: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty." Article first, § 14, provides: "The citizens have a right, in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remonstrance."

of the chief. Id., 736–37. He brought his claim under a federal statute, 42 U.S.C. § 1983,[6] alleging a violation of his first amendment rights. In reviewing his claim, we affirmed the rights of public employees to speak, without fear of retribution, on matters of public concern. Id., 749. We recognized, however, the government's "legitimate interest in regulating the speech of its employees . . . ." (Internal quotation marks omitted.) Id.

To accommodate these "competing interests," we adopted a "balancing test." *Schnabel* v. *Tyler*, supra, 230 Conn. 749; see *Bieluch* v. *Sullivan*, 999 F.2d 666, 670 (2d Cir. 1993), cert. denied, 510 U.S. 1094, 114 S. Ct. 926, 127 L. Ed. 2d 219 (1994). To establish a prima facie case under this test, the public employee must prove that: "(1) his speech can be fairly characterized as constituting speech on a matter of public concern; and (2) [his] speech was at least a *substantial or motivating* factor in the [transfer] . . . ." (Emphasis added; internal quotation marks omitted.) *Schnabel* v. *Tyler*, supra, 750. If the employee proves these two elements, the burden then shifts to the employer, who may still avoid liability by proving either that: "(1) he would have made the same decision in the absence of the protected conduct; or [(2) the employee's] conduct interfered with the [government agency's] effective and efficient fulfillment of its responsibilities to the public . . . ." (Internal quotation marks omitted.) Id.; *Frank* v. *Relin*, 1 F.3d 1317, 1328–29 (2d Cir.), cert. denied, 510 U.S. 1012, 114 S. Ct. 604, 126 L. Ed. 2d 569 (1993).

---

[6] Title 42 of the United States Code, § 1983, entitled "Civil Action for Deprivation of Rights," provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

We need not decide today whether the legal analysis announced in *Schnabel* for actions brought under 42 U.S.C. § 1983 applies equally to actions brought under § 31-51q. Even if we were to assume, arguendo, that the *Schnabel* test governs § 31-51q actions, the plaintiffs must still meet the burden imposed upon them by the *Schnabel* test. This they have failed to do. In its memorandum of decision, the trial court explicitly found the "absence of *any evidence* to support [the plaintiffs'] claim that [they] were transferred on account of their alleged protected activity . . . ." (Emphasis added.)

Contrary to the plaintiffs' suggestion, we do not read the trial court's language so literally as to mean that the plaintiffs did not produce any evidence from which an inference *could have been drawn* to support their contention, irrespective of the inferences that the court actually *did* (or did not) draw. Rather, we read this language, consistent with its context and the rest of the trial court's memorandum of decision, to mean that the trial court was not persuaded by any of the evidence adduced to support the plaintiffs' contention.

Because the trial court's finding is supported by the record, we conclude that the plaintiffs, having failed to adduce *any persuasive* evidence to support their claims that the allegations against Petrowski entered into the defendants' decision to transfer them, have likewise failed to establish that these allegations were "at least a substantial or motivating factor" in their transfers. *Schnabel* v. *Tyler*, supra, 230 Conn. 750. In light of this finding, the plaintiffs have not satisfied the second prong of the *Schnabel* test.

The plaintiffs contend, however, that the trial court's factual finding with regard to causation was "unsupported by the evidence." Appellate review of findings of fact "is limited to deciding whether such findings were clearly erroneous." (Internal quotation marks

omitted.) *Napoletano* v. *CIGNA Healthcare of Connecticut, Inc.*, 238 Conn. 216, 232, 680 A.2d 127 (1996). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation marks omitted.) *Dornfried* v. *October Twenty-Four, Inc.*, 230 Conn. 622, 636, 646 A.2d 772 (1994). "We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached." (Internal quotation marks omitted.) *State* v. *Newsome*, 238 Conn. 588, 598, 682 A.2d 972 (1996).

Mindful of this limited scope of review, we hold that the record contains sufficient support for the trial court's finding that the plaintiffs' transfer was not a product of their allegations against Petrowski. McGoldrick testified that, at a time well before the plaintiffs complained about Petrowski, he had considered ordering transfers out of the northwest office of the task force in order to boost productivity there. The trial court heard testimony that McGoldrick had met with other officers to discuss transfers from the northwest office *five days* before McGuire brought the plaintiffs' allegations to the attention of the internal affairs unit. McGoldrick further testified that he first became aware of the McGuire memorandum on March 17, 1993, more than a month and a half after he had ordered the plaintiffs' transfers. We conclude that this evidence renders the trial court's finding not clearly erroneous. See *Dornfried* v. *October Twenty-Four, Inc.*, supra, 230 Conn. 636.

Seeking to diminish the force of this evidence, the plaintiffs point to portions of the trial record that, they claim, demonstrate that McGoldrick was aware of and motivated by the McGuire memorandum in ordering the

plaintiffs' transfers.[7] The trial court, however, credited McGoldrick's testimony that he did not learn of the McGuire memorandum until March 17, 1993. We have reviewed the entire transcript and conclude that the trial court was well within its discretion in determining that the evidence weighed in the defendants' favor. "Weighing the evidence and judging the credibility of the witnesses is the function of the trier of fact and this court will not usurp that role." (Internal quotation marks omitted.) *Temple* v. *Meyer*, 208 Conn. 404, 407, 544 A.2d 629 (1988).[8]

---

[7] The plaintiffs contend: (1) that McGoldrick testified that he did not believe that the decline in the northwest office's productivity was due to the plaintiffs; (2) that no defense witness could clearly articulate what sort of "feuding" had taken place in the northwest office; and (3) that McGoldrick, in his testimony, expressed only a "vague belief" that the plaintiffs had copied some of Petrowski's time sheets and, therefore, he could not have been motivated by this information.

[8] The plaintiffs make three other arguments with regard to the trial court's finding on causation. First, they contend that abundant "circumstantial evidence," such as the plaintiffs' noteworthy employment records and the temporal proximity between the creation of the McGuire memorandum and their transfers, suggests that their transfers were directly related to their allegations against Petrowski. In making these arguments, the plaintiffs invite us to weigh the evidence in this case. Weighing evidence, however, is beyond the scope of our review. See *Temple* v. *Meyer*, supra, 208 Conn. 407.

Next, the plaintiffs point out that Coyle, who also had a signature line on the McGuire memorandum but who never actually signed it, was not transferred. They contend that this demonstrates that the transfers were intended as retribution against only those who voiced openly their concerns about Petrowski. Again, to the extent that this argument goes to the weight of the evidence, we have determined that the trial court's finding was not clearly erroneous, and we are thus bound by that finding. We point out, however, that at the *time of the transfer* on the morning of February 10, 1993, Coyle and both plaintiffs were in the exact same position vis-a-vis the McGuire memorandum: none of them had yet signed it. Thus, even if McGoldrick knew about the McGuire memorandum, he would have also believed Coyle was making the same allegations. The fact that Coyle was not also transferred, therefore, only buttresses the trial court's finding that the transfers were not retaliatory.

Finally, the plaintiffs draw our attention to the fact that the trial court refused to dismiss the case against McGoldrick and Cioffi at the conclusion of the plaintiffs' case. The plaintiffs claim that this refusal contradicts the trial court's posttrial finding that there was no evidence showing causation.

In light of the trial court's finding of fact, which we conclude was not clearly erroneous, the plaintiffs have failed to establish the requisite causal connection between their alleged exercise of constitutional rights in their complaints about Petrowski and their transfers to another duty station. In the absence of causation, their claims under § 31-51q cannot be sustained.

The judgment is affirmed.

In this opinion CALLAHAN, C. J., and BORDEN and KATZ, Js., concurred.

BERDON, J., dissenting. The issue raised in this case is whether the plaintiffs, Eugene D'Angelo and Vincent DeRosa, state police officers, were disciplined as a result of the exercise of their protected speech rights under the federal and state constitutions, and therefore are entitled to the remedies provided under General Statutes § 31-51q.[1] Section 31-51q is designed to provide a statutory remedy for violations by employers, including government employers, of an employee's first amendment rights under the United States constitution and article first, §§ 3, 4 and 14 of the Connecticut constitution.[2] I disagree with the majority's conclusion that, notwithstanding the trial court's failure to apply the correct analysis, a trier of fact could not find the neces-

On a motion to dismiss, however, all of the plaintiffs' evidence must be considered true and "interpreted in the light most favorable to him, and every reasonable inference is to be drawn in his favor." *Hinchliffe* v. *American Motors Corp.*, 184 Conn. 607, 609–10, 440 A.2d 810 (1981). "Once a case is presented to the trial court for final decision, [however] the trier is released from having to treat the plaintiff's evidence as true and can disbelieve any evidence, even if the evidence is uncontroverted." (Internal quotation marks omitted.) *Walshon* v. *Walshon*, 42 Conn. App. 651, 654, 681 A.2d 376 (1996). Thus, we find no inconsistency in the trial court's initial refusal to grant a motion to dismiss, and its conclusion, at the end of the case, that the plaintiffs had failed to adduce any evidence to support their claims.

[1] See footnote 1 of the majority opinion.

[2] See footnote 5 of the majority opinion.

sary causal connection between the disciplinary transfers of the plaintiffs and the exercise of their constitutionally protected speech.

## I

In *Schnabel* v. *Tyler*, 230 Conn. 735, 749, 646 A.2d 152 (1994), for violations of 42 U.S.C. § 1983, the comparable federal statute to § 31-51q, we pointed out the following: "It is well settled that persons do not relinquish their first amendment rights to comment on matters of public interest by becoming government employees. *Rankin* v. *McPherson*, 483 U.S. 378, 383–84 [107 S. Ct. 2891, 97 L. Ed. 2d 315] (1987); *Connick* [v. *Myers*, 461 U.S. 138, 140, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)]; *Pickering* [v. *Board of Education*, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)]. It also has been recognized that the government has a legitimate interest in regulating the speech of its employees that differs significantly from its interest in regulating the speech of people in general. [*Pickering* v. *Board of Education*, supra, 568.] *Piesco* v. *New York Dept. of Personnel*, 933 F.2d 1149, 1155 (2d Cir.), cert. denied, 502 U.S. 921, 112 S. Ct. 331, 116 L. Ed. 2d 272 (1991)." (Internal quotation marks omitted.)

We stated in *Schnabel* that, "in order to accommodate these competing interests," a balancing test must be employed to determine whether a government employee is entitled to § 1983 damages resulting from disciplinary action taken with respect to his protected speech. Id. For an employee to establish a prima facie case, he must prove that: "(1) his speech can be fairly characterized as constituting speech on a matter of public concern; and (2) [the] speech was at least a substantial or motivating factor in the discharge . . . . *Frank* v. *Relin*, [1 F.3d 1317, 1328–29 (2d Cir.), cert. denied, 510 U.S. 1012, 114 S. Ct. 604, 126 L. Ed. 2d 569 (1993)]. If both of these elements are proven by [the

employee, the government employer] may still avoid liability if he establishes that either: (3) he would have made the same decision in the absence of the protected conduct; or (4) [the employee's] conduct interfered with the [employer's] effective and efficient fulfillment of its responsibilities to the public . . . ." (Internal quotation marks omitted.) *Schnabel* v. *Tyler*, supra, 230 Conn. 750.

Those same competing interests arise when applying § 31-51q and can best be resolved by adopting the same analysis set forth in *Schnabel*. Furthermore, we are usually guided by federal precedent with respect to state statutes that are comparable to federal law. See *Levy* v. *Commission on Human Rights & Opportunities*, 236 Conn. 96, 103, 671 A.2d 349 (1996) ("we review federal precedent concerning employment discrimination for guidance in enforcing our own antidiscrimination statutes"); see also *Miko* v. *Commission on Human Rights & Opportunities*, 220 Conn. 192, 202, 596 A.2d 396 (1991). Accordingly, I would definitively hold that, at least with respect to speech involving matters of public concern,[3] the *Schnabel* test must be satisfied in order to meet the requirements of a § 31-51q action.[4]

## II

The majority holds that, under any analysis, the plaintiffs failed to prove the causation element necessary to invoke § 31-51q. I disagree.

---

[3] Because the plaintiffs' speech in this case clearly constitutes a matter of public concern, I need not address whether the protected speech for a § 31-51q action has a broader application than a § 1983 action. See M. Margulies, "Sherlock Holmes and Connecticut's Free Speech Statute," 68 Conn. B.J. 456 (1994).

[4] Furthermore, the *Schnabel* test is in harmony with our holding in related matters with respect to employment discrimination (including discrimination by government) in which we adopted the "mixed-motive/*Price Waterhouse* model." *Levy* v. *Commission on Human Rights & Opportunities*, supra, 236 Conn. 106 (plaintiff establishes prima facie case by establishing "that he or she is within a protected class and that an impermissible factor played a 'motivating' or 'substantial' role in the employment decision").

Preliminarily, although the majority does not discuss it, I point out that the plaintiffs' speech clearly implicates a matter of public concern. Speech will be fairly characterized as a matter of public concern if the speech "relat[es] to any matter of political, social, or other concern to the community." *Connick* v. *Myers*, supra, 461 U.S. 146. Whether speech involves a matter of public concern is a question of law to be determined on the basis of "the content, form, and context of a given statement, as revealed by the whole record." Id., 147–48; see id., 148 n.7.

Here, the plaintiffs' speech involved the suitability for promotion of Sergeant John Petrowski, who, along with the plaintiffs, was assigned to the statewide narcotics task force (task force). Those allegations focused on the integrity of Petrowski that included improper claims for overtime, improper use of state funds to purchase alcohol, and the inclusion of false information in certain search warrants, as well as improper procedures used in undercover purchases of illicit drugs. The plaintiffs' speech was clearly a matter of public concern. See *Schnabel* v. *Tyler*, supra, 230 Conn. 754–55 (concluding that police officer's allegations of chief of police's abuse of authority and misconduct constituted matters of public concern); see also *Sheppard* v. *Beerman*, 911 F. Sup. 606, 609, 611 (E.D.N.Y. 1995) (concluding that law clerk's accusation that judge was "corrupt" and a "son of a bitch" in context that judge acted improperly in several cases constituted speech on matter of public concern), vacated on other grounds, 94 F.3d 873 (2d Cir. 1996).

The trial court, however, utilized an incorrect standard for the second prong of the *Schnabel* test. The trial court analyzed the second prong by considering whether the plaintiffs were transferred on account of the exercise of their first amendment rights. Under the *Schnabel* test, however, the inquiry is merely whether

the plaintiffs' speech was "at least a substantial or motivating factor" in the transfers. There is, of course, a substantial difference between determining whether the transfers were "on account of" the speech—that is, solely caused by—or whether the speech was "at least a substantial or motivating factor"—that is, only one reason among other motivations. The trial court's memorandum of decision opinion underscored this distinction with the finding that the plaintiffs failed to establish that the transfers were "on account of their alleged protected activity . . . ."

The majority excuses the trial court's use of this incorrect standard by stating that, under any analysis, the trial court's finding that the disciplinary transfers of the plaintiffs made by the defendant Captain John McGoldrick could not possibly have been a result of the exercise of their protected speech is conclusive based upon two assumptions. First, the trial court credited McGoldrick's testimony that he "first became aware of [a written memorandum of Sergeant William McGuire that memorialized the plaintiffs' protected speech (McGuire memorandum)] on March 17, 1993, more than a month and a half after he had ordered the plaintiffs' transfers." Therefore, the majority concludes that the speech could not have been a motivating factor. McGoldrick, however, testified that he first actually *saw* the McGuire memorandum on March 17, 1993, but he also testified that he could not recall when he first became aware of the plaintiffs' complaint. Thus, the trial court incorrectly concluded that it was not until March 17, 1993, that McGoldrick became aware of the complaint.

Furthermore, the trial court in its memorandum of decision pointed to a number of facts that allegedly establish that the plaintiffs' protected speech did not lead to their transfers. Those facts, however, are not supported by the record. Specifically, the trial court

found that McGoldrick had transferred the plaintiffs because of low productivity at their office. In his testimony, however, McGoldrick specifically stated that the low productivity was not a result of the plaintiffs, but that "it was the result of a lot of issues." Moreover, the trial court found that the "final straw" was a report by Master Sergeant Joseph Lavin to McGoldrick that the plaintiffs were observed copying Petrowski's routines, and thereafter McGoldrick immediately requested their transfers. McGoldrick's testimony, however, is to the contrary. In response to questioning regarding whether a specific event occurred that led to the determination to transfer the plaintiffs, McGoldrick testified: "I don't recall a specific event." Accordingly, the evidence does not support the trial court's findings. "This appeal presents one of the rare cases in which the trial court abused its broad discretion . . . by making crucial findings [that are] not reasonably supported by the facts. . . ." (Citation omitted; internal quotation marks omitted.) *Fahy* v. *Fahy*, 227 Conn. 505, 517, 630 A.2d 1328 (1993); see *D'Ascanio* v. *D'Ascanio*, 237 Conn. 481, 487, 678 A.2d 469 (1996) ("[t]his court may reject a factual finding if it is clearly erroneous, in that as a matter of law it is unsupported by the record, incorrect, or otherwise mistaken" [internal quotation marks omitted]).

The majority also claims that McGoldrick planned the transfer of the plaintiffs prior to February 10, 1993, the day the plaintiffs signed the McGuire memorandum. But this misses the point. The plaintiffs were only required to establish that the protected speech was a motivating factor in the transfer and, as I will discuss later in this opinion, there was more than sufficient circumstantial evidence to support such a finding. The claim that McGoldrick would have made the transfer, notwithstanding the protected speech, is a matter that comes within the context of the third prong in the

*Schnabel* test—that is, the employer "would have made the same decision in the absence of the protected conduct"—a factor that the employer is required to prove in order to avoid liability under *Schnabel.*[5]

Although there may not have been any direct evidence to support a finding that the plaintiffs were transferred on account of their protected speech, there was indeed sufficient circumstantial evidence to establish that their speech was "at least a substantial or motivating factor" in their disciplinary transfers. In public employment disciplinary actions based on an employee's exercise of first amendment rights, "[a]n inference of prohibited motive can be drawn from circumstantial evidence." 2 H. Perritt, Employee Dismissal Law and Practice (3d Ed. 1992) § 7.21, p. 98; see *Cox* v. *Dardanelle Public School District,* 790 F.2d 668, 675–76 (8th Cir. 1986). Indeed, in cases such as this, plaintiffs are seldom able to prove their claim by direct evidence and are usually constrained to rely on circumstantial evidence. See *Chambers* v. *TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir. 1994) ("[e]mployers are rarely so cooperative as to include a notation in the personnel file that their actions are motivated by factors expressly forbidden by law" [internal quotation marks omitted]).

In this case, the plaintiffs offered the following evidence to prove that their speech was "at least a substantial or motivating factor" in their disciplinary transfers. During their tenure at the task force, the plaintiffs had continually received satisfactory to superior performance evaluations. D'Angelo received a national award as well as a commendation from the United States attorney for the District of Connecticut for his work on the task force. On February 4, 1993, DeRosa informed

---

[5] With respect to this prong of the *Schnabel* test, the trial court also employed the wrong standard by placing the burden of proof on the plaintiffs, rather than on the defendants. See *Schnabel* v. *Tyler,* supra, 230 Conn. 750.

Sergeant Roy Beavers of the internal affairs unit of the Connecticut state police that, because of Petrowski's transgressions, Petrowski was ill suited for his pending promotional transfer to the internal affairs unit. DeRosa also voiced his complaint regarding the transgressions of Petrowski to McGuire, his former supervisor. Subsequently, McGuire spoke with D'Angelo, who described additional concerns about Petrowski. On February 9, 1993, McGuire also brought the plaintiffs' allegations to the attention of officials at the internal affairs unit. On that same day, McGoldrick advised his superior, the defendant Major Reuben Bradford, that Petrowski's pending transfer to the internal affairs unit was being canceled.

The next day, February 10, McGoldrick stated that he was " 'tired of the recriminations' " and that transfers were forthcoming. In fact, McGoldrick wrote in his day book "[9:45 a.m.]—at Northwest Office—Sgt. [Dennis C.] Coyle, Det. DeRosa, and D'Angelo told that I am sick of recriminations and that transfers would be made." On that date, the plaintiffs were transferred and Petrowski's pending transfer to the internal affairs unit was canceled—all by the same teletype. On the basis of this circumstantial evidence, if the proper standard were utilized, a trier of fact could reasonably infer that the plaintiffs' allegations with respect to the integrity of Petrowski were a substantial or motivating factor in their subsequent disciplinary transfers.

Furthermore, Coyle, who refused to come forward with the plaintiffs and McGuire with respect to the allegations concerning Petrowski, was not transferred. In fact, although a space was provided for his signature on the McGuire memorandum, Coyle did not sign the document. Indeed, approximately one week earlier, Coyle had told McGuire that he "didn't want to be part of this." Therefore, a trier of fact could have reasonably inferred that Coyle was not transferred because he had

disavowed any involvement in the plaintiffs' allegations with respect to Petrowski.

Additionally, the arbitration proceeding that preceded the trial, the results of which were admitted into evidence, provides further evidence that the plaintiffs' transfers were, indeed, disciplinary. Prior to trial, the plaintiffs filed a grievance pursuant to their union collective bargaining agreement, seeking reinstatement to their positions on the task force. Finding that the disciplinary transfer provisions of the collective bargaining agreement were violated when the plaintiffs were transferred, the arbitrator ordered that the plaintiffs be reinstated to the task force.

The majority concedes that there was circumstantial evidence to support the second prong of the *Schnabel* test, but then curiously concludes "that the trial court was not persuaded by any of the evidence adduced to support the plaintiffs' contention." Again, however, this misses the point. The trial court failed to apply the correct standard that the plaintiffs were required merely to prove that their protected speech was a motivating factor, but rather applied the wrong standard—requiring the plaintiffs to prove that their disciplinary transfers were made on account of their protected speech. If the correct standard were applied, a trier of fact could have found that the plaintiffs' protected speech was indeed a motivating factor in the disciplinary transfers. Under such circumstances, the judgment of the trial court should be reversed. See, e.g., *Borkowski* v. *Borkowski*, 228 Conn. 729, 740, 638 A.2d 1060 (1994) (reversing trial court's ruling and remanding for new hearing on motion for modification where trial court applied wrong standard of law); *In re Keijam T.*, 221 Conn. 109, 126–28, 602 A.2d 967 (1992) (reversing trial court's order of transfer from juvenile docket to regular criminal docket and remanding for new transfer hearing where trial court applied improper standard to minor's

offer of proof); *Quintana* v. *Warden*, 220 Conn. 1, 6, 593 A.2d 964 (1991) (reversing judgment and remanding for new hearing on habeas petition where habeas court applied incorrect standard in reviewing petitioner's claim for ineffective assistance of counsel); *Tessitore* v. *Tessitore*, 31 Conn. App. 40, 42–43, 623 A.2d 496 (1993) (reversing judgment in part and ordering new trial where, in marriage dissolution action, trial court applied wrong standard of proof in determining real estate transfer constituted fraudulent conveyance).

Accordingly, I respectfully dissent.